UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BRENDA AIMEE SMITH                          CIVIL ACTION

VERSUS                                      NUMBER: 11-02011

MICHAEL J. ASTRUE,                          SECTION: "I"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits. (Rec. docs. 16, 17, 19).

Brenda Aimee Smith, plaintiff herein, protectively filed the subject application for SSI benefits on July 8, 2009, alleging disability as of January 1, 1998. (Tr. pp. 22, 106).[1]/ In a

_____

[1]/ Plaintiff's application for SSI benefits is not contained within the administrative record that was provided to the Court by the Commissioner. As plaintiff utilizes the filing date that was recited by the Administrative Law Judge (rec. doc. 16-1, p. 2; tr.

Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as depression, bi-polar disorder, anxiety, two herniated discs in the neck, back and spine injury, obsessive compulsive disorder, and suicidal tendencies. (Tr. pp. 120-129).[2]/ Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on October 9, 2009. (Tr. pp. 71-74). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on June 9, 2010 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 22, 39-68). On August 5, 2010, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 19-38). The Appeals Council ("AC") subsequently denied plaintiff's request for review

p. 22), the Court will do likewise.

[2]/ The second page of this report indicates that plaintiff became unable to work due to these conditions on January 1, 1998. (Tr. p. 121). However, the report goes on to state that plaintiff worked subsequent to the latter date until January 30, 2008 when her employer ceased operations. (Id.). The individual who completed this form is not identified. (Tr. p. 129).

Another Disability Report in the record reveals that plaintiff had filed a previous application for Disability Insurance Benefits that was denied at the initial step of the Commissioner's administrative review process on April 29, 2004 and was not appealed further. (Tr. p. 106-107).

of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 3-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment plaintiff frames the issues for judicial review as follows:

1. [t]he ALJ issued an unfavorable decision, and the Appeals council denied the claimant's request for review, without either having discussed why the evidence did not satisfy 20 C.F.R. 404, Subpart P, Appendix 1, Listing 1.04.

2. [t]he final decision of the Commissioner does not comply with 20 C.F.R. Section 416.927(d), and good cause was not shown to reject the opinion of the claimant's treating specialist.

3. [t]he claimant's allegations of restrictions in the use of her dominant upper extremity were improperly rejected without the assessment of the credibility which is required by the regulations.

4. [t]he vocational testimony does not carry the Commissioner's burden of proof at the final step in the sequential evaluation process, because the ALJ failed to accurately advise the vocational expert of the claimant's mental restrictions.

(Rec. doc. 16-1, p. 1).

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1. [t]he claimant has not engaged in substantial gainful activity since July 8, 2009, the application date (20 CFR 416.971 et seq.).

2. [t]he claimant has the following severe impairments: status post anterior cervical decompression and fusion at

3

C5-7, degenerative disc disease of the lumbar spine, and Bipolar Disorder II (20 CFR 416.920(c)).

3.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.   [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work, generally defined in 20 CFR 416.967(b) as work requiring lifting/carrying no more than 10 pounds frequently and 20 pound occasionally, and no more than 6 hours of standing/walking in an 8 hour workday, with the additional nonexertional limitations of work requiring occasional crouching, crawling, and stooping, limited overhead reaching, no climbing of ladders, ropes, scaffolds, no work on vibrating/uneven surfaces, and work of a simple, routine nature with limited public contact.

5.   [t]he claimant is unable to perform any past relevant work (20 CFR 416.965).

6.   [t]he claimant was born on November 27, 1968 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   [t]he claimant has a limited education and is able communicate in English (20 CFR 416.964).

8.   [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.   [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

> 10. [t]he claimant has not been under a disability, as defined in the Social Security Act, since July 8, 2009, the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 24, 25, 26, 32, 33).

Judicial review of the Commissioner's decision to deny SSI benefits is limited to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. Cook v. Heckler, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not

the courts.  Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  Harrell, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

> 1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>
> 2.  an individual who does not have a "severe impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.
>
> 4.  if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.
>
> 5.  if an individual's impairment precludes her from

performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

The documentary evidence admitted in the proceedings below[3] includes records of a clinical assessment of plaintiff that was performed by Dr. Mihnea Dumitrescu of Interventional Spine

---

[3] Although plaintiff alleged disability as of January 1, 1998 and some of the treatment records go back as far as 2002, neither of the parties discuss any of the records pre-dating 2006. Given the rather voluminous nature of the medical records, the Court will follow suit and will limit its discussion to the records that were generated in 2006 and the years that followed.

Specialists on July 24, 2006 pursuant to a referral from one of plaintiff's treating physicians, Dr. Thomas Cockerham. Plaintiff's major complaint was chronic intermittent neck and shoulder girdle pain for several years following an initial injury in May/June of 2004. At the time of the evaluation, plaintiff was undergoing physical therapy at Dr. Cockerham's office every three weeks and she had been seen at the Magnolia Clinic in April of 2005 where she received bilateral S1 transforaminal epidural steroid injections. Plaintiff had midline lower third cervical pain that was aching in character and was aggravated by driving, flexion of the neck, and housework. She also suffered from shoulder girdle pain and paresthesias in the form of pins and needles which sometimes radiated into the thumbs bilaterally. An MRI that was performed revealed mild central stenosis at C4-5 and C5-6, moderately severe central stenosis at C6-7, mild bilateral lateral stenosis at C5-6 and C6-7, and moderate maturation/degeneration of the discs at C5-6 and C6-7 with bridging anterior osteophytes. As an initial intervention, plaintiff was administered a C7/T1 interlaminar epidural steroid injection which actually increased her pain from 2/100 to 50/100 but it was hoped that good relief would be realized once the solution was absorbed in the adjacent soft tissues. (Tr. pp. 329-334). The results of the evaluation were provided to Dr. Cockerham on July 26, 2006. (Tr. pp. 335-336).

On January 9, 2007, plaintiff underwent an MRI of the lumbar spine without contrast with the examination indicator being low back pain for four months. That test produced results suggestive of a prominent posterior herniation at L5-S1 toward the right with accompanying tear of the posterior longitudinal ligament and effacement of the right S1 nerve root; posterior protrusion at L4-5 with accompanying annular tear; a complex mass lesion within the pelvis; and, a 3.5 centimeter lesion within the left adnexa which may be ovarian in etiology. (Tr. pp. 337-340).

Pursuant to another referral from Dr. Cockerham, on August 9, 2007, plaintiff was evaluated by Dr. Bradley Bartholomew, a neurosurgeon. Plaintiff related a seventeen-year history of neck pain from falling off of a chair and a five to six-year history of lower back pain since an incident at a plant nursery. Her lower back was constant, at a level of 8-9/10, and it increased with prolonged sitting and standing. Plaintiff also had constant pain down the right leg. Neck pain was not constant or daily but may persist for weeks at a time when it was present. That pain went to both shoulders and the interscapular area and plaintiff had pain and numbness down the right arm to the thumb. There was no upper extremity weakness but plaintiff's fingers frequently had spasms. Upon physical examination, plaintiff had normal strength in the extremities but straight leg raising was positive on the right at

60 degrees and sensation was decreased in the right S1 distribution and the first two fingers. Plaintiff had bilateral trapezius spasm and tenderness with a normal range of neck motion and there was bilateral paravertebral tenderness to the back without spasm. Based upon the results of his examination and a review of various diagnostic test results, Dr. Bartholomew believed that plaintiff was a good candidate for a C6 corpectomy and fusion and he also discussed the option of a right L5-S1 discectomy versus a two-level fusion. (Tr. pp. 341-342).

Between January 3, 2007 and August 11, 2008, plaintiff was seen by Dr. Cockerham approximately twenty-one times on a nearly monthly basis. On the first of those dates, plaintiff was followed for cervical stenosis, lumbar radiculopathy, and discogenic pain with increased right lower extremity pain, spasm and numbness, and increased neck pain. A physical examination revealed a decreased cervical range of motion in all planes, decreased sensation on the right greater than the left to the long/index fingers and right lateral thigh, positive straight leg raising on the right, and positive tenderness to palpation. The assessment was cervical degenerative disc disease ("DDD"), herniation, cervical stenosis/radiculopathy, lumbar radiculopathy/herniation/DDD, and myofascial tender points. A surgical consultation was to be obtained and plaintiff was given refills on her Lortab, Soma, and

Valium. (Tr. p. 464). Plaintiff realized good pain relief by February 1, 2007 and her pain medication had been decreased from six dosages per day to two-to-three dosages per day. Prescription refills were given. (Tr. p. 463). Plaintiff was seen again by Dr. Cockerham on March 8, 2007 for continued complaints of chronic cervical and lumbar pain despite having received epidural steroid injections to the lumbar area with good results. Physical examination revealed a positive Hoffman's sign, the right greater than the left. Plaintiff's gait was stable and no atrophy was present. The assessment was chronic cervical/lumbar pain and plaintiff was given refills on her prescription medications. (Tr. p. 462).

By April 5, 2007, plaintiff's low back pain had returned, the right greater than the left. Straight leg raising was positive, the right greater than the left, and she had positive myofascial tender points and spasm. However, her gait was stable, there was no evidence of atrophy or Hoffman's sign, strength was 5/5 throughout, and sensation was grossly intact. The assessment was cervical stenosis/DDD/degenerative joint disease ("DJD") and lumbar radiculopathy/DDD/DJD. Epidural steroid injections were to be administered, prescription medications were refilled, and plaintiff was given several forms of physical therapy. (Tr. p. 461). Plaintiff complained of increased low back pain and right lower

extremity pain on May 2, 2007 and the injections she had received were "wearing off". Plaintiff had spasm and trace deep tendon reflexes to the lower extremity but her gait was stable, strength was 5/5 throughout, and sensation was grossly intact. Medication refills were authorized. (Tr. p. 460). Neck, lower back, and right lower extremity pain were the complaints on May 24, 2007. Plaintiff had positive straight leg raising, the right greater than the left, and a bilateral Hoffman's sign. The assessment was chronic cervical stenosis/radiculopathy and low back pain/radiculopathy. Refills of Lortab and Soma were authorized. (Tr. p. 459).

Plaintiff had tenderness to palpation of the lumbosacral area when she was next seen by Dr. Cockerham on June 25, 2007 as well as positive myofascial tender points and spasm. The assessment was stable cervical stenosis and lumbar radiculopathy. Plaintiff was given refills on her Lortab and Soma and received several forms of physical therapy. (Tr. p. 458). On July 23, 2007, plaintiff's presenting problems were described as a history of severe cervical stenosis and low back/lower extremity pain, known spondylosis, and disc herniation. Upon physical examination, there was tenderness to palpation of the cervical and thoracic spines, positive spasm, the left greater than the right, and tenderness to palpation of L2 to L5. Motor strength and sensation were grossly intact. The

assessment was chronic neck/low back pain. Plaintiff was given refills for Lortab and Soma and several forms of physical therapy and was waiting to see a neurologist. (Tr. p. 457). Plaintiff's symptoms were essentially the same on August 23, 2007 except that she now had myelopathic symptoms. She had by that time been seen by Dr. Bartholomew and expressed a desire to proceed with a cervical procedure. Plaintiff's pain was stable on this date as was her upper extremity function and her spasm and pain had improved with medication. The assessment was cervical stenosis/DDD/herniated nucleus pulposus ("HNP") and lumbar radiculopathy/HNP. Medications were refilled and physical therapy was administered. (Tr. p. 456).

Plaintiff's symptoms persisted when she was next seen by Dr. Cockerham on September 12, 2007 and she was scheduled to undergo an anterior cervical diskectomy and fusion ("ACDF") one week later, having already gone through pre-op procedures. Her low back pain was stable and deep tendon reflexes were intact but there was a positive Hoffman's sign bilaterally. Motor strength and sensation were grossly intact. The assessment was cervical stenosis/DDD/radiculopathy and plaintiff was given refills for Lortab and Soma. (Tr. p. 455). Plaintiff was slowly healing from the ACDF procedure by the time of her next office visit on October 17, 2007. Her condition was said to be improving and she was using only Lortab and Soma for pain relief and had lost some weight. The

assessment was chronic neck/low back pain and status-post ACDF. Refills on the Lortab and Soma were given and plaintiff also received some physical therapy. (Tr. p. 454).

By November 16, 2007, plaintiff's neck and low back pain and spasm had improved, her right hand numbness had decreased, and her bladder urgency had resolved. Plaintiff's pain was controlled with her medication regimen. Cervical spine range of motion was guarded secondary to surgery and the Hoffman's sign was negative bilaterally. The assessment was chronic neck/low back pain and status post-ACDF, healing. Medication refills were given. (Tr. p. 453). Plaintiff's neck was still improving on December 14, 2007 and her upper extremity and bladder symptoms were much better although she did suffer from occasional upper extremity numbness, the right greater than the left. Nevertheless, neck/upper back pain and spasm continued. Hoffman's sign was negative bilaterally, motor strength was 5/5 throughout, and sensation was grossly intact but deep tendon reflexes were decreased at the right ankle. The assessment was chronic discogenic/myofascial/radicular pain and plaintiff was continued on her medication regimen. (Tr. p. 452). Plaintiff was status-post ACDF secondary to myelopathic symptoms along with lumbar radicular/discogenic pain when she was next seen by Dr. Cockerham on January 14, 2008. Pain continued but was decreased to her upper extremity and hand. Tender myofascial

points were demonstrated through physical examination. Plaintiff was given refills on her prescription medications. (Tr. p. 451).

On February 13, 2008, plaintiff reported to Dr. Cockerham that she had fallen two weeks earlier and had suffered a right hip/buttock contusion and an increase in pain to the lumbosacral area. Once again, there were positive myofascial tender points but plaintiff's gait was stable and sensation and motor strength were grossly intact. The assessment was chronic neck/low back pain and plaintiff was continued on her medications. (Tr. p. 450). On March 13, 2008, plaintiff was described as status-post ACDF and experiencing lumbosacral discogenic/radicular pain. Epidural steroid injections in the past were said to have helped and although pain still existed, it was decreased to plaintiff's upper extremity. The assessment was stable chronic neck/low back pain and plaintiff was given medication refills. (Tr. p. 449). Plaintiff had increased right shoulder and low back pain when she was next seen by Dr. Cockerham on April 11, 2008 but no new pain locales or quality and she was trying to exercise four times per week. Spasm was present as were myofascial tender points and positive straight leg raising on the right. The assessment was stable post ACDF and neck/low back pain and plaintiff's medications were refilled. (Tr. p. 448).

At her next evaluation by Dr. Cockerham on May 12, 2008

plaintiff was said to be experiencing decreased upper extremity symptoms but an increase in neck/low back pain and an exacerbation of low back and buttock pain, the right greater than the left. Plaintiff had obtained good relief with epidural steroid injections. Upon physical examination, plaintiff's gait was stiff, there were positive myofascial points, and straight leg raising was positive on the right. The assessment was stable post ACDF and lumbosacral discogenic/radicular pain. Once again, plaintiff was given refills on her prescription medications and further injections were contemplated. (Tr. p. 447). Presenting complaints on June 11, 2008 were chronic lumbosacral and neck pain and status-post ACDF. Deep tendon reflexes were decreased at the ankle, the right greater than the left, there was tenderness to palpation on the right side, and straight leg raising was positive on the right. The assessment on this date was status-post ACDF and lumbosacral radiculopathy. Refills to plaintiff's Lortab and Soma were authorized and Mobic was added to her prescription regimen. Further epidural steroid injections were contemplated versus a nerve root block. (Tr. p. 446).

On July 11, 2008, plaintiff was described as ACDF secondary to stenosis and L4-5 disc pathology and mechanical lumbosacral pain. Additional injections had provided only modest relief. Examination revealed positive spasm and myofascial tender points, absent deep

tendon reflexes at the left ankle, and a positive Hoffman's sign. The assessment was stable cervical/lumbar pain. Further medication refills were given. (Tr. p. 445). Plaintiff's low back, neck, and upper back pain were characterized as stable on August 11, 2008. Her gait was stable but there were positive myofascial tender points and straight leg raising was positive on the right. The assessment was chronic neck/low back/extremity pain and plaintiff was maintained on her medications. (Tr. p. 444).

In the interim, plaintiff had undergone some gynecological procedures on July 8 and 16, 2008 which revealed marked squamous dysplasia. (Tr. pp. 235, 278, 234, 268, 269, 279). The affected area had apparently been excised by August 6, 2008. (Tr. pp. 263-264, 267, 272). Plaintiff returned to Dr. Cockerham on September 10, 2008 who declared her chronic neck and low back pain, status-post ACDF, and lumbosacral radiculopathy as stable through the administration of epidural steroid injections, Soma, and Lortab which helped greatly. The results of the physical examination on this date were largely normal. The assessment was cervical stenosis status-post ACDF and lumbosacral disc herniation with disc radiculopathy/myofascial pain. (Tr. p. 488). On October 10, 2008, plaintiff complained of chronic pain due to a fall with an increase in lower extremity pain and spasm. The assessment was status-post fall and cervical/lumbar chronic pain. Lortab and Soma refills

were authorized and plaintiff was to receive further epidural steroid injections. (Tr. p. 487). Plaintiff had a decreased range of cervical motion when she was next seen by Dr. Cockerham on November 10, 2008 but was otherwise stable. The assessment was cervical stenosis status post ACDF, cervical DDD/DJD, and lumbosacral radiculopathy. Further medication refills were authorized. (Tr. p. 486).

On November 24, 2008, plaintiff was seen by Dr. Colin Bailey for sneezing and a nasal infection, medication refills, and depression, having previously taken Toprol. The doctor noted a history of suicidal attempts and plaintiff was experiencing problems with her daughter at the time and was known to cry easily. Zoloft was prescribed. (Tr. pp. 500, 465-466, 507-509). Plaintiff underwent diagnostic testing on December 1, 2008 in connection with complaints of chest pain. The results of a myocardial perfusion scan were negative and an echocardiogram revealed only mild intermittent mitral valve prolapse of the anterior leaflet with trivial to mild mitral regurgitation. (Tr. pp. 512-514, 467-469). Plaintiff was then seen by Dr. Cockerham again on December 5, 2008. On that date, she complained of residual neck pain, upper back pain/spasm, lumbosacral pain secondary to HNP, radiculopathy on the right greater than the left, parathesias, and occasional weakness. Plaintiff's gait was stable and motor strength was 5/5 but deep

tendon reflexes were 2+ at the knees and a trace at the ankles. The assessment was chronic pain to the neck, low back, and extremities. She was to obtain further epidural steroid injections as needed and was given refills on her regular medications in addition to samples of Cymbalta and Toprol as Zoloft had caused side effects. (Tr. p. 485).

On December 10, 2008, plaintiff received follow-up care for vulvular dysplasia and reported that all of her symptoms had resolved. (Tr. pp. 261-262, 265-266, 270-271). Plaintiff was next seen by Dr. Bailey on January 12, 2009 and reported that she could not tolerate Zoloft and was sleeping and crying a lot. However, the Cymbalta that had been prescribed by Dr. Cockerham seemed to be helping and plaintiff was experiencing less crying and depression. The assessment was major depression and plaintiff was given a prescription for Cymbalta. (Tr. p. 499). The following day plaintiff returned to Dr. Cockerham who found her neck/upper back/upper extremity pain and symptoms to be stable and her lumbosacral radiculopathy to be stable. Cymbalta was helping without any adverse side effects. Upon physical examination, plaintiff had a stable cervical-thoracic/upper extremity range of motion, deep tendon reflexes were intact, motor strength was 5/5, and there was no evidence of atrophy. The assessment was chronic neck/upper back/low back pain and status-post ACDF. Medication

refills were once again authorized and plaintiff was to obtain epidural steroid injections as needed. (Tr. pp. 328, 484).

Plaintiff was seen again by Dr. Cockerham on March 10, 2009 and she reported nocturia over the previous three months along with some blurry vision and weight gain. Although there were myofascial tender points plaintiff's gait was stable, she had a full range of motion of the upper extremities, and the Hoffman's sign was negative. The assessment was chronic neck/low back pain, status-post ACDF, and possible diabetes. Further prescription refills were authorized. (Tr. pp. 327, 483). On April 3, 2009, plaintiff was seen by Dr. Bailey in connection with complaints of pelvic pain and frequent urination. Appendicitis was suspected and plaintiff was immediately referred to the River Parishes Hospital for a CT scan and further testing. (Tr. pp. 498, 504-506). Following that testing and confirmation of the suspected diagnosis, plaintiff underwent an appendectomy and was discharged home the following day. (Tr. pp. 284-286).

On April 9, 2009, plaintiff returned to Dr. Cockerham for her monthly visit with her musculoskeletal status again being described as stable. She did, however, have an antalgic gait on the right and a positive Hoffman's sign on the left. The assessment was abdominal pain, acute status-post open appendectomy; cervical stenosis/radiculopathy and status-post ACDF; and, lumbosacral

radiculopathy. Medications were prescribed and addition epidural steroid injections and surgery were contemplated. (Tr. p. 326). Plaintiff's gait was stable when she was next seen by Dr. Cockerham on May 8, 2009 but straight leg raising was positive on the right greater than the left. Plaintiff's prescription medications were refilled. Based upon a review of Dr. Cockerham's treatment note, it appears that plaintiff was scheduled to undergo a surgical procedure in the near future and further epidural steroid injections were to be scheduled only with the surgeon's clearance. (Tr. pp. 325, 481).

Plaintiff was next seen by Dr. Bradford Thompson of the River Parishes Hospital on or about May 14, 2009 for evaluation of gallstones with mild attacks of biliary colic. Based on the results of his evaluation, Dr. Thompson recommended that plaintiff undergo a laparoscopic cholecystectomy. (Tr. pp. 282-283). When plaintiff was next seen by Dr. Cockerham on June 8, 2009, she reported having undergone that procedure in the latter portion of May without complications. Plaintiff also reported an increase in her neck and right shoulder pain prior to her surgery which had since resolved. The diagnosis was chronic cervical/lumbar and upper and lower extremity pain and plaintiff was given further prescription refills for Lortab, Soma, Valium, and Cymbalta. (Tr. pp. 324, 480).

On June 9, 2009, plaintiff returned to Dr. Bailey with the chief complaint being an elevated glucose reading and a request to be tested for hepatitis C. (Tr. p. 497). The administrative record also contains a "Function Report-Adult" form that was presumably completed by plaintiff at or around the time she filed her application for SSI benefits on July 8, 2009. In that form, which elicited information about how plaintiff's conditions limited her activities, plaintiff indicated that she was temporarily living with her sister at the time who was recovering from colon cancer surgery. A typical day for plaintiff consisted of rising in the morning, taking her pain medication, and tending to her sister. She then made coffee and did housework in increments due to back pain and sciatica, taking anti-depressants along the way. Standing too long or bending over sometimes made plaintiff's legs give out. More often than not, plaintiff would skip lunch. Naps were necessitated by fatigue and the effects of her medications. Plaintiff would then watch TV, eat dinner, bathe, and attempt to sleep throughout the night.

Continuing, plaintiff indicated that dressing was sometimes difficult as bending would cause her back and legs to give out. Other personal care activities were problematic due to limitations on reaching, lifting, or with memory. Plaintiff could prepare meals but had to alternate standing and sitting while she cooked.

Plaintiff needed encouragement while doing housework due to depression. She could go out alone, drive, and shop in stores or via the internet. Plaintiff could also tend to financial matters but sometimes needed to be reminded. Hobbies and interests included TV, music, reading the Bible, and occasionally attending church. Plaintiff socialized once or twice per month but sometimes had problems getting along with others due to mood swings and depression. Back, neck, and leg pain affected nearly all of plaintiff's abilities and she estimated that she could walk only one block before needing to rest for twenty minutes. Plaintiff did not handle stress well and became depressed, paranoid, or had suicidal thoughts. She had also been diagnosed with ADD years earlier and was more recently suffering from vulvar dysplasia. (Tr. pp. 142-150).

By the time that she returned to Dr. Cockerham on July 9, 2009, plaintiff had been scheduled to undergo another gynecological procedure on July 20, 2009. There were positive myofascial points and a positive Hoffman's sign on the right and decreased deep tendon reflexes to the right ankle 1+. The assessment was chronic cervical/lumbar/upper and lower extremity pain. Prescriptions renewals for Lortab, Soma, and Valium were given and Wellbutrin was approved for plaintiff's use. (Tr. pp. 323, 479). Plaintiff's neck and back symptoms were said to be stable again on August 11, 2009

as was her gait but there was a positive Hoffman's sign bilaterally. The assessment was chronic neck/low back pain. Plaintiff was given further medication refills and an epidural steroid injection was to be scheduled in the next seven to ten days. (Tr. p. 478). The following day plaintiff was seen again by Dr. Bailey for complaints of a knot in the right axilla and to discuss weight loss/diet pills. Antibiotics were prescribed. (Tr. p. 496). Plaintiff was seen yet another time by Dr. Cockerham on September 10, 2009 and was administered an epidural steroid injection. She related right leg symptoms to the sole of her foot and the doctor's treatment note references the results of a lumbar MRI as demonstrating involvement at L5-S1 and right S1 nerve root compression. Plaintiff's medications were refilled. (Tr. p. 477).

On September 17, 2009, plaintiff was consultatively evaluated by Dr. Miljana Mandich of Internal Medicine Associates of New Orleans, LLC. Plaintiff's major complaints at the time were depression and low back pain with the depression reportedly going back some twenty-one years when she first met her husband. Plaintiff was separated at the time and related a hospitalization in 1992 following a suicidal attempt with alcohol and pills and a hospitalization in 2001 for suicidal thoughts. She had sustained a neck injury nineteen years earlier and a back strain in 2003 and advised the doctor of her ACDF in 2007, an abdominal hysterectomy

in 2004, and an appendectomy and cholecystectomy earlier in the year. Plaintiff had last worked at a bingo hall in 2007. She advised Dr. Mandich that she still had some neck muscle pain but that her neck was much improved since her surgery without the pain and numbness that she once had. Pain to the low back was described as localized to the middle of the lower back at waist level and to the right from the midline at the sacroiliac junction level with occasional shooting pains from the right buttock all the way down the back of the leg to the ankle.

Upon physical examination, plaintiff was noted to ambulate without difficulty and without the need of assistive devices. Her gait was normal. Range of motion of the neck was normal with no complaints and range of motion of her lower back was normal except for backward extension that was limited to twenty degrees with pain to the middle of the back as described above. Plaintiff had no pain in the right leg at the time of the evaluation. She was able to walk on her heels and toes and to squat and rise without difficulty and straight leg raising was negative bilaterally. Plaintiff had a full range of motion of all joints with no visible abnormalities of the bones, joints, or muscles. Neurologically, muscle bulk, tone, and strength were preserved in all extremities, grip strength was normal bilaterally, sensation and reflexes were intact, and 1+ symmetrical deep tendon reflexes were present in all

extremities.  Plaintiff exhibited no nervousness, depressed mood, or flat affect and there was no evidence of memory problems.

X-rays of plaintiff's cervical spine that were taken at the time of Dr. Mandich's evaluation revealed a loss of normal cervical lordosis and status-post surgical anterior inner body fusion at C5, C6, and C7.  Those of the lumbar spine demonstrated hypertrophic spurring of the anterior superior aspect at the body of L5.  The doctor's diagnosis was a history of neck injury nineteen years earlier and status-post ACDF in 2007 with a good result; low back pain with periodic right sided leg pain since an injury in 2003; a history of alcohol abuse until 2003; and, depression with a history of suicidal ideation and suicidal attempt. (Tr. pp. 349-358).

Plaintiff was next seen by Dr. Bailey on September 18, 2009 for complaints of depression, a desire to quit smoking, and a bump under her right arm.  The assessment was bipolar disorder and plaintiff was prescribed Chantix and was referred to another doctor for her right axillary abscess. (Tr. p. 495).

On September 21, 2009, plaintiff underwent a consultative psychological evaluation by Dr. Scuddy Fontenelle, III.  Plaintiff advised the doctor of her physical problems, which included neck and back injuries and chronic pain, and mental health symptoms, which included mood swings, ADHD, obsessive compulsive disorder ("OCD"), and bipolar disorder.  Plaintiff recalled inpatient and

outpatient treatment for depression, mood swings, and suicidal thinking with hospitalizations in 1992 and 1997. She advised Dr. Fontenelle that she was very particular and obsessive in her thinking and compulsive in her actions, often becoming frustrated when furniture was moved out of place or when she saw wrinkled sheets or an unmade bed. She also proclaimed to be a "germaphob".[4]/ Plaintiff's medications at the time were Diazepam, Hydrocodone, Carisoprodol, Cymbalta, Bupropion, and Metoprolol. Her medical history was notable for an August 2007 neck/spinal surgery; an appendectomy, gallbladder removal, and hysterectomy; right leg weakness secondary to a herniated disc and arthritis of the thoracic spine; and, a torn rotator cuff.

Plaintiff's speech was understood with 100% accuracy, she was able to follow multiple-step instructions and to understand the limits of confidentiality, and her cooperation was excellent. Thinking was reality-based and she was largely focused on her physical symptoms of leg, back, and shoulder pain despite being medication compliant. There was no evidence of hallucinations, thought disorders, delusional thinking, or schizophrenia. Plaintiff's mood was euthymic with overall talkativeness and

---

[4]/ The second page of Dr. Fontenelle's report is not included within the copy of the report that was filed in the administrative record.

restlessness but she appeared to be somewhat manic in disposition. Conversation shifted from one topic to another. Plaintiff admitted to mood swings and manic symptoms including insomnia and cleaning binges in the middle of the night. She also had depressed symptoms when she became more withdrawn, socially inactive, and lethargic and her recent separation had prompted passive suicidal thoughts. Memory functions were considered adequate as was intellect. Social reasoning and problem-solving skills were good and personal insight was considered to be fair. Socially, plaintiff had well-developed expressive and receptive communication skills. She could tend to her own needs, warm food, operate a microwave, and drive a car but housekeeping was limited by pain, weakness, or lethargy. Plaintiff could not stand for long periods of time due to back pain and neck pain caused her to be uncomfortable when sitting. Dr. Fontenelle's diagnostic impressions were as follows: Axis I - OCD, bipolar disorder II, and pain disorder with physical and psychological components; Axis II - none; Axis III - herniated disc and arthritis; Axis IV - mild to moderate stressors; and, Axis V - a GAF of 50. Plaintiff was deemed to be capable of managing funds, was complaint with prescribed medications, and received outpatient mental health services. (Tr. pp. 360-362).

Plaintiff returned to Dr. Bailey on September 30, 2009 for follow-up of her major depression; she was not suicidal at the

time. (Tr. p. 494).  On October 7, 2009, Dr. Charlotte Ducote, an Administration Medical Consultant ("MC"), reviewed plaintiff's file and set forth her findings in several standardized forms.  In a "Psychiatric Review Technique" form, Dr. Ducote indicated that plaintiff's mental conditions were being evaluated against the criteria of Sections 12.04, 12.06, 12.07, and 12.09 of the Listing of Impairments.  Although plaintiff suffered from bipolar disorder, OCD, pain with both physical and psychological components, and a past history of substance abuse, those conditions did not precisely satisfy the criteria of any of the four noted listings.  The doctor went on to find that plaintiff was mildly restricted in the activities of daily living, had moderate difficulties in maintaining social functioning and in maintaining concentration persistence or pace, and had experienced one or two episodes of decompensation of extended duration.  However, the evidence did not establish the presence of the "C" criteria of Listings 12.04 or 12.06.  Plaintiff's symptoms and limitations were deemed to be only partially credible. (Tr. pp. 372-385, 371).

The second standardized form that was completed by Dr. Ducote was denominated "Mental Residual Functional Capacity Assessment".  There, the doctor found that plaintiff was moderately limited in the ability to understand and to remember detailed instructions but was not significantly limited in the other two areas of

29

understanding and memory; was moderately limited in four of the enumerated areas of sustained concentration and persistence but was not significantly limited in the other four; was moderately limited in three of the areas of social interaction but was not significantly limited in the other two; and, was moderately limited in two of the areas of adaptation but was not significantly limited in the two others. In the portion of the form where Dr. Ducote was asked to elaborate on her findings she noted that plaintiff was capable of understanding, remembering, and carrying out simple instructions and performing routine tasks. Although plaintiff may be overly talkative when manic and could become withdrawn when depressed, she could tolerate some stress and tension. (Tr. pp. 395-398).

Plaintiff was next seen by Dr. Cockerham on October 8, 2009, being described as status-post ACDF secondary to myelopathy/HNP/spondylosis. There were no upper extremity symptoms at the time and plaintiff's low back pain was characterized as stable. Upon physical examination, plaintiff had a decrease in cervical rotation/full flexion/extension and there were positive myofascial points but there was no atrophy and motor strength was grossly intact. Prescription refills were authorized. (Tr. p. 476). The following day, Dr. Cockerham completed a form on plaintiff's behalf for the issuance of a handicap hang-tag or

license plate, indicating that plaintiff was permanently impaired as a result of "... a diagnosed disease or disorder, including a severe arthritic, neurological, or orthopedic impairment, which creates a severe mobility limitation." (Tr. p. 404).

On that same day, Dr. Julius Isaacson, an Administration MC, reviewed plaintiff's file and set forth his findings in a "Physical Residual Functional Capacity Assessment" form. There, the doctor found that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could never climb a ladder/rope/scaffolds and could occasionally crawl but could frequently perform other postural maneuvers; was limited in reaching but had no other manipulative limitations; had no visual or communicative limitations; and, was to avoid concentrated exposure to vibration but had no other environmental limitations. From an orthopedic standpoint, plaintiff was deemed to be only partially credible as it was believed that she should be capable of more activity than that which she alleged. (Tr. pp. 387-394, 386).

Plaintiff was seen again by Dr. Bailey on October 14, 2009 for follow-up care of her depression. She was reportedly more agitated after taking Symbyax but had done well on Seroquel/Celexa that she had obtained from River Oaks Hospital. Plaintiff was known to

"snap" over stupid things and any minor situation and she had been experiencing headaches to the left frontal area for two weeks. On the personal front, plaintiff's twelve-year old child had been diagnosed with ADHD, her eighteen year-old had moved back in with her and was not working or in school, and her twenty year-old was in prison. The assessment was a mood disorder, OCD, and ADHD. Alexa and Seroquel were prescribed. (Tr. p. 493). The locales and quality of plaintiff's pain were stable when she was next seen by Dr. Cockerham on November 6, 2009. Straight leg raising was positive on the right. The assessment was chronic pain syndrome and plaintiff was given Lortab and Soma refills. (Tr. p. 475).

Pursuant to a request from Dr. Patricia Braly, on December 14, 2009 plaintiff underwent a CT scan of the chest, with and without contrast, at the East Jefferson General Hospital ("EJGH"). That testing revealed mild paraseptal emphysema but was otherwise unremarkable. (Tr. pp. 407, 426). Plaintiff then underwent a laser procedure for recurrent vulvar dysplasia at the hands of Dr. Braly on December 16, 2009. (Tr. pp. 413-417, 424-425). She was next seen by Dr. Cockerham on January 6, 2010. Hoffman's sign was positive on the left and straight leg raising was positive on the right. Medication refills were authorized. (Tr. p. 423).

On January 29, 2010, plaintiff was seen at the River Parishes Mental Health Clinic ("RPMHC") with the screening diagnoses being

rule out bipolar disorder, rule out OCD, and rule out major depressive disorder. Presenting symptoms included feeling depressed and stressed out, frequent crying, lack of interest, diminished energy, insomnia, anxiety attacks, and mood swings. Past hospitalizations for suicidal attempts and depression were noted as was a history of alcohol and drug abuse and sexual abuse by others. Physical problems recited by plaintiff included headaches, emphysema, hepatitis B, mitral valve prolapse, epilepsy, a pinched nerve with sciatica down to the right food, a ruptured disc and torn ligaments in the lower back, and a herniated disc. Plaintiff was living alone again after her eighteen year-old daughter had moved out. A long history of family discord was recounted. A psychiatric evaluation with Dr. McClendon was scheduled for March 5, 2010. (Tr. pp. 436-443, 185-194).

Plaintiff was next seen again by Dr. Cockerham on February 5, 2010. Her gait was stable but there were positive myofascial tender points and spasm. The assessment was chronic neck and low back pain and plaintiff was given further refills for Lortab, Soma and Valium. (Tr. p. 422). Plaintiff then underwent a psychiatric evaluation by Dr. McClendon of RPMHC on March 5, 2010. Her mood was characterized as euphoric and her speech was pressured. Memory was intact, insight/judgment were fair, and her intelligence was said to be average. The Axis I diagnosis was possible Attention

Deficit Disorder ("ADD") with a GAF of 50 under Axis V. Ambien and Cymbalta were prescribed. (Tr. p. 181-184).

On March 9, 2010, plaintiff returned to Dr. Cockerham for further follow-up care. The Hoffman's sign was negative but straight leg raising was positive. Once again, plaintiff was given refills on her three principal prescribed medications. (Tr. p. 421). She was next seen by Dr. Bailey on April 7, 2010 with presenting complaints being crying, a pounding heart, insomnia, a busy mind, and crazy dreams. Plaintiff denied suicidal thoughts. She appeared to be poised for another surgical procedure as the doctor declared that her pre-operative test results were good. The assessment was major depression and Tegretol was prescribed. An ECG that was done at the time produced normal results. (Tr. pp. 409-410, 492, 511). Plaintiff was seen yet again by Dr. Cockerham on April 8, 2010 who described her as status-post ACDF and lumbosacral discogenic/radicular pain to the lower extremities. Prescription medication refills for Lortab, Soma, Valium, and Doxepin were authorized. (Tr. p. 420). On that same date plaintiff was fitted with a Holter monitor to address concerns over heart palpitations. Following twenty-four hours of monitoring the results of the test revealed a normal sinus rhythm throughout the study with an average heart rate of 85 beats per minute and no supraventricular or ventricular ectopy. (Tr. pp. 408, 510).

34

In connection with the then-impending administrative hearing, on May 19, 2010 plaintiff identified the drugs she was taking at the time as Lortab, Soma, Valium, Doxepin, Cymbalta, Tegretol, and Strattera in addition to fish oil and calcium supplements. (Tr. p. 195). On May 25, 2010, Dr. Cockerham authored correspondence to plaintiff's attorney in which he recalled having treated plaintiff for painful conditions of the cervical and lumbar spines. The doctor advised that plaintiff was status-post ACDF at C5, C6, and C7 with prominent disc herniation at L5-S1 and an accompanying tear of the posterior longitudinal ligament of the lumbar spine and effacement of the right S1 nerve root. There was also posterior protrusion of the L4-5 invertebral disc with an accompanying annular tear for which plaintiff had been prescribed Lortab, Soma, and Valium. Dr. Cockerham noted that plaintiff had received multiple series of epidural steroid injections with no lasting pain relief. Functionally, the doctor remarked that plaintiff could not remain in any position, whether it be sitting, standing, or walking, for more than fifteen minutes at a time. She reportedly averaged no more than five hours of sleep per night secondary to pain, had daytime fatigue, and would have difficulty sustaining work at any level, likely needing frequent rest breaks at least two to three hours per day on an intermittent basis during which she would have to lie down or recline. (Tr. p. 433).

As noted earlier, a hearing before an ALJ went forward on June 9, 2010. Plaintiff was forty-one years of age at the time, had completed nine grades of formal education, and had past relevant work experience as a waitress and a bartender, having last worked in 2007. When asked why she was unable to work, plaintiff testified to experiencing pain to the lower back on standing or sitting for long periods of time. She also suffered from sciatica to the right leg which caused it to give out and plaintiff to collapse. In terms of treatment, plaintiff had received epidural steroid injections, pain medication, muscle relaxers, and a sleep aid for relief of her symptoms and had undergone various diagnostic tests including x-rays, MRI's, and a CAT scan at the direction of Dr. Cockerham. Plaintiff had also undergone neck surgery at the hands of Dr. Bartholomew which helped somewhat and she was treated by Dr. Bailey for depression. The RPMHC had reportedly refused to treat her any further after she had missed an appointment. (Tr. pp. 41-47).

An average day for plaintiff consisted of watching TV, doing a little housework, and resting/sleeping a good deal. She was capable of sweeping, mopping, washing dishes in increments, doing laundry, cooking several days per week, shopping on "good" days, and visiting with others. Plaintiff did no yardwork and she played puzzles and computer games for enjoyment. Plaintiff could drive but complained of grogginess as a medication side-effect. To aid

with sleep, plaintiff took Doxepin and Valium. Plaintiff estimated that she could walk 3/4 of a block, stand for twenty minutes, sit for twenty-five minutes, and lift the weight equivalent of two gallons of milk. Manipulating her hands for too long caused her fingers to lock up and muscle spasms in her right arm. She also experienced problems with writing. Before her neck surgery plaintiff had reportedly undergone nerve conduction studies ("NCS") which revealed nerve damage to the right arm. Non-exertionally, plaintiff experienced problems getting along with others and was occasionally anti-social, paranoid, and experienced mood swings. (Tr. pp. 47-51).

Upon being tendered to her attorney for further questioning plaintiff was referred to a RPMHC treatment note of January 29, 2010 which indicated that she had been involved in four suicide attempts, the first one being in 1992 and another one occurring in 2002. Although plaintiff was capable of performing some activities of daily living on "good" days, on "bad" days, she would have diminished interest, no desire to interact with others, frequent crying spells, and general isolation. On such days, which reportedly occurred between eight to ten times per month, plaintiff would do no housework or shopping and would not brush her teeth, bathe, or get dressed. Reflecting back on an April 7th visit to Dr. Bailey, plaintiff testified that she was having back problems at

the time and that her heart was pounding when she appeared for the evaluation. She further indicated that she typically had to lie down for three to four hours per day due to pain and a lack of interest. Plaintiff's attorney referenced a note from Dr. Cockerham dated September 10, 2009 in which he observed that S1 nerve root compression had been demonstrated through an MRI. Plaintiff had received injections to her back on May 10, 2010. Medications at the time included Lortab, Soma, and Valium. After writing four to five words, plaintiff would lose control over her fingers. Plaintiff had underdone Holter monitor testing at the behest of Dr. Bailey and she now saw Dr. Cockerham once per month. (Tr. pp. 51-56).

Crystal Younger, a VE, was the next witness to take the stand. She began her testimony by classifying plaintiff's past jobs as a waitress and bar attendant as light, semi-skilled work. The ALJ then posed a hypothetical question to the VE which assumed an individual of plaintiff's age, education, and work experience who could perform light-level work subject to certain postural, manipulative, and environmental limitations and who required work of a simple, routine nature. Faced with those limitations, the VE testified that the individual described in the hypothetical question would be unable to perform plaintiff's past work. However, the individual could function as a food preparation

worker, a dining room attendant, or a cashier, with significant numbers of such jobs existing in the national and local economies. The ALJ then posed a second hypothet to the VE which contained the same profile as the first but the individual was to have only limited contact with the public. In answer thereto, the VE testified that the food prep worker was still a viable option as were the jobs of dishwasher and hand packer subject to a 25% reduction in job availability due to a deficit in overhead reaching. (Tr. pp. 56-60).

In her third hypothetical question, the ALJ asked the VE to assume the same basic profile as the second one but the individual was limited to sedentary work. With those limitations in mind, the VE testified that the described individual could function as a clerk/bookkeeping order clerk, office clerk, and light truck driver, jobs which existed in significant numbers. Finally, the ALJ posed a fourth hypothet to the VE which added the requirement that the individual had to take unscheduled breaks or be absent from work more than twice per month. In answer to that question, the VE testified that the described individual would be unable to work. Plaintiff's counsel had no questions for the VE. (Tr. pp. 60-62). He did, however, recall plaintiff to the stand who testified that she sometimes experienced problems with fingering which was consistent with Dr. Cockerham's note of December 7, 2009

that was positive for ulnar neuropathy on the right. That treatment note and another one from August 11, 2009 were to be submitted to the ALJ by plaintiff's attorney after the hearing. In closing, plaintiff testified that she would be unable to perform work in which she would be required to pick up small objects for 1/3 of the day. (Tr. pp. 62-68).

Pursuant to a referral from Dr. Cockerham, on November 5, 2010 plaintiff received a neurosurgery consultation by Dr. Kelly Scrantz. As part of that evaluation Dr. Scrantz reviewed MRI results from 2007 which revealed a right-sided L5-S1 large herniated disc which was thought to account for plaintiff's right leg symptoms. Although plaintiff had radicular symptoms, she had very little, if any, back pain and an updated MRI was to be obtained for consideration of a right-sided L5-S1 minimally invasive diskectomy. The results of a spinal examination that was conducted that date revealed a normal curvature, no significant muscle spasm, no tenderness to palpation, normal flexion and extension without pain, negative straight leg raising, normal muscle tone, strength, and sensation, and an absent ankle jerk on the right but normal on the left. (Tr. pp. 519-522).

Plaintiff underwent a repeat MRI of the lumbar spine on November 19, 2010 with testing indicators being identified as low back and right leg pain. The radiologist's impression was disc

degeneration at L4-5 and L5-S1 and focal disc extrusion to the right with inferior migration at L5-S1 and minimal compromise of the exiting right S1 root. Facet disease was also present bilaterally at L4-5 and L5-S1. (Tr. pp. 523-524). Plaintiff was then seen by Dr. Scrantz that day and was said to be having significant issues with her right leg with that being her biggest problem by far. Although treating options were limited, Dr. Scrantz believed that plaintiff was in need of a decompression of the S1 nerve root and he planned to proceed ahead with a right-sided L5-S1 minimally invasive diskectomy. (Tr. p. 518).[5]/

Plaintiff challenges the Commissioner's decision to deny SSI benefits on four grounds. In the first of those, plaintiff argues that the ALJ issued an unfavorable decision, and the AC subsequently denied her request for review, without either of them having discussed why the evidence did not satisfy the criteria of Section 1.04(A) of the Listing of Impairments. (Rec. doc. 16-1, pp. 10-12).

In her written decision of August 5, 2010, the ALJ found that

_____

[5]/ Subsequent to the issuance of the ALJ's decision, plaintiff's counsel sent correspondence to the AC dated February 1, 2011 in which he referenced having previously submitted medical records from St. Charles Behavioral to the Administration by cover letter of December 7, 2010. (Tr. pp. 203-204). Neither counsel's letter of December 7, 2010 nor the records from St. Charles Behavioral are part of the administrative record that was filed herein.

plaintiff had not engaged in substantial gainful activity since the date that the application for SSI benefits was filed and that she suffered from severe impairments in the form of status-post ACDF at C5-7, DDD of the lumbar spine, and bipolar disorder II. (Tr. pp. 24-25). Proceeding to step three of the §416.920 sequential analysis, the ALJ then considered whether plaintiff had an impairment or combination of impairments that met or medically equaled one of those set forth in the Listing of Impairments, 20 C.F.R. Part 404, Subpt. P, App. I, initially stating as follows:

> [i]n accordance with *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007, the undersigned has considered the impairments listed in Appendix 1 to Subpart P of Part 404 of the Regulations and finds that the claimant's impairments do not singularly or in combination meet or medically equal the required criteria ... of any listed impairment including impairments listed under section 1.01, Category of Impairments, musculoskeletal, <u>specifically</u> <u>Listing</u> <u>*1.04*</u>, <u>*Disorders*</u> <u>*of*</u> <u>*the*</u> <u>*spine*</u>; section 12.01, Category of Impairments, Mental Disorders, Listing *12.04*, *Affective Disorders*. The signs, symptoms, an history of treatment presented in the evidence of record are inconsistent with any impairments of listing-level severity. A further analysis of the evidence supporting this finding is below.

> (Tr. p. 25)(emphasis added).

Immediately following these comments, the ALJ provided an explanation of why plaintiff's mental impairments did not satisfy the criteria of Section 12.04 of the Listing of Impairments. (Tr. pp. 25-26). However, no discussion of the evidence pertaining to plaintiff's musculoskeletal conditions appears until later in the

42

ALJ's decision. (Tr. pp. 27-32).

In Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007), the Fifth Circuit found that an ALJ's failure to identify the listing for which the claimant's symptoms failed to qualify or to provide any explanation as to how she made that determination constituted error as "... '[s]uch a bare conclusion is beyond meaningful judicial review.'" Id. (quoting Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996)(footnote omitted)). Although an ALJ is not always required to do an exhaustive point-by-point discussion of the evidence, his or her decision must be susceptible of thoughtful court scrutiny. Id. However, even where a step three violation has occurred, such must be subjected to a harmless error analysis to determine whether the substantial rights of a party have been affected. Id. (quoting Mays, 837 F.2d at 1364). That showing typically requires a claimant to demonstrate that her impairment satisfies the criteria of a particular listing. Id. at 448-49; Hemosillo v. Astrue, No. 10-CV-0198, 2011 WL 4528206 at *4-5 (N.D. Tex. Sept. 12, 2011), adopted, 2011 WL 4528374 (N.D. Tex. Sept. 30, 2011); Moore v. Astrue, No. 07-CV-422, 2008 WL 4602732 at *2 (N.D. Tex. Aug. 13, 2008).

Section 1.04(A) of the Listing of Impairments provides that an individual will be deemed disabled if she suffers from:

1.04 *Disorders of the spine* (e.g. herniated nucleus

pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

As the introductory paragraphs to the Section 1.00 listings make clear, a claimant is required to prove a loss of function as a result of a musculoskeletal impairment by demonstrating either an "... inability to ambulate effectively on a sustained basis ..., or the inability to perform fine and gross movements effectively on a sustained basis ..." 20 C.F.R. Part 404, Subpt. P., App. 1, §1.00(B)(2)(a); Audler, 501 F.3d at 448-49; Hemosillo, 2011 WL 4528206 at *4. Furthermore, "[t]he inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months." §1.00(B)(2)(a). As this is a third-step inquiry under §416.920, it is the claimant who bears the burden of proving that her impairment or combination of impairments meets or equals a listing. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999). "For a claimant to show that [her] impairment matches a listing, it must

44

meet _all_ of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990)(footnote omitted).

Unlike the factual situation that was present in Audler, the ALJ in this case specifically indicated that plaintiff's musculoskeletal impairments were being measured against the criteria set forth in Listing 1.04(A). (Tr. p. 25).  Even if she had not, because the ALJ proceeded past step three of the §416.920 sequential analysis, an argument could be made that she implicitly found that plaintiff's impairments did not satisfy the criteria of Section 1.04(A).  Hernandez v. Heckler, 704 F.2d 857, 860 (5th Cir. 1983); Moore, 2008 WL 4602732 at *2 n. 5.  Although it would have been preferable for the ALJ to have discussed the evidence that she considered immediately following her step-three finding, remand is appropriate only if plaintiff demonstrates that she meets the requirements of Listing 1.04(A).  Audler, 501 F.3d at 449.  On that score, plaintiff points to MRI evidence of the effacement of the right S1 nerve root; radiculopathy to the right lower extremity as documented by Drs. Cockerham and Bartholomew; muscle weakness and limitation of lumbar spine motion as found by Drs. Cockerham, Bartholomew, and Mandich; sensory loss and diminished reflexes as observed by those three practitioners; and, positive straight leg

45

raising as documented by Drs. Cockerham and Bartholomew. (Rec. doc. 16-1, pp. 10-11). Plaintiff also cites to Dr. Scrantz' finding of nerve root compromise. (Id.). However, in none of those straight leg raising findings did the doctors indicate that the results were positive in both the sitting and supine positions as Section 1.04(A) mandates. Moreover, the loss of function required by Section 1.04(A) has not been proven here as the Court is pointed to no evidence demonstrating an inability to ambulate or to perform fine and gross movements effectively for a twelve-month period. Without those required showings, plaintiff has not proven that her substantial rights have been affected and any error on the part of the ALJ at step three of the §416.920 analysis was harmless.

In her second challenge to the Commissioner's decision, plaintiff alleges that the ALJ erred by failing to give controlling weight to the opinions of Dr. Cockerham as set forth in the doctor's letter to plaintiff's attorney dated May 25, 2010. (Rec. doc. 16-1, pp. 12-14).

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of any physician when the evidence supports a contrary conclusion. Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000)(quoting Paul v. Shalala, 29 F.3d 208, 211 (5th Cir. 1994), overruled in part on other grounds by Sims v. Apfel, 530 U.S. 103,

120 S.Ct. 2080 (2000)). A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown. Newton, 209 F.3d at 456 (citing Brown v. Apfel, 192 F.3d 492, 500 (5th Cir. 1999) and Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984 (1995)). Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion. Newton, 209 F.3d at 456; Bradley v. Bowen, 809 F.2d 1054, 1057 (5th Cir. 1987); Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985). The Regulations require the ALJ to perform a detailed analysis of a treating physician's views under the criteria set forth in 20 C.F.R. §416.927(d) only in the absence of controverting medical evidence from other treating and/or examining physicians. Newton, 209 F.3d at 453.

In the present case, after finding that plaintiff's impairments failed to satisfy the criteria of any of those set forth in the Listing of Impairments, the ALJ made an assessment of plaintiff's residual functional capacity ("RFC"). (Tr. p. 26). In doing so, the ALJ methodically discussed plaintiff's hearing testimony and the treatment and examination records from various practitioners including Drs. Cockerham, Mandich, Fontenelle, and

Bailey. (Tr. pp. 26-31). After discussing that objective medical evidence, the ALJ turned to the missive at issue, as follows:

> [i]n addition to the objective medical evidence, the undersigned has considered statements from treating and examining physicians in assessing the claimant's residual functional capacity, as required by 20 CFR 404.1527 and 416.927, and Social Security Ruling 96-2p. The undersigned has given <u>little</u> <u>weight</u> to the medical statement provided on May 25, 2010, by Dr. Cockerham, the claimant's treating physician (Exhibit 25F). Dr. Cockerham who is not an orthopedic surgeon or a neurosurgeon, opined the claimant could not sit, stand, or walk longer than 15 minutes at a time, and would require frequent rest breaks for at least 2-3 hours a day on an intermittent basis. Dr. Cockerham's opinion is not entitled to controlling weight as he relies solely on the claimant's surgical status and an MRI study of the lumbar spine of January 2007 in setting forth the claimant's limitations, and ignores the fact that the MRI findings, which do not clearly reflect nerve root compression, are inconsistent with his clinical examinations. Since the filing of her SSI application, clinical findings merely document positive straight leg raising but normal tone, muscle strength (Exhibit 23F/3) and stable gait (Exhibit 23F/4). While the claimant's back condition could be expected to cause some levels of pain, the level of dysfunction asserted by Dr. Cockerham in Exhibit 25F is not substantiated by the objective medical evidence, the other medical record of evidence (sic) or the examination findings of the consultative examiner, Dr. Miljana Mandich.

(Tr. p. 31)(emphasis added).

In addressing plaintiff's second challenge, the Court notes that Dr. Cockerham's letter of May 25, 2010 is devoid of any contemporaneously-recorded, medically acceptable findings and is thus entitled to little weight on that basis alone. <u>Warncke v.</u> <u>Harris</u>, 619 F.2d 412, 417 (5th Cir. 1980). In none of the

contemporaneous treatment notes documenting plaintiff's numerous office visits did Dr. Cockerham impose any limitations on plaintiff's activities. Included within those are Dr. Cockerham's note of April 8, 2010, the last office visit plaintiff had with him prior to the letter at issue, in which the doctor found that plaintiff's condition was stable with a full range of motion in the cervical and lumbar spines and with muscle strength being grossly intact. (Tr. p. 420). When she was examined by Dr. Mandich on September 17, 2009, plaintiff had a normal gait and was noted to ambulate without difficulty. With the exception of backward extension, the range of motion of plaintiff's lower back was normal, she had no pain in her right leg, and straight leg raising was negative bilaterally. Muscle bulk, tone, and strength were preserved in all extremities, and sensation and reflexes were intact.

Plaintiff had very little, if any, back pain when she was seen by Dr. Scrantz on November 5, 2010 and a spinal examination revealed no significant muscle spasm, no tenderness to palpation, normal flexion and extension without pain, negative straight leg raising, and normal muscle tone, strength, and sensation. Contrary to plaintiff's present assertions, the ALJ did not give Dr. Cockerham's May 25, 2010 opinions no weight; rather, she declined to give them controlling weight but afforded them some weight,

albeit little. In light of the conflicting evidence before her, the Court is unable to say that the ALJ's assessment of the evidence was an unreasonable one. To the extent that Dr. Cockerham's opinions embraced issues such as plaintiff's RFC and her ability to work, such issues are reserved to the ALJ. 20 C.F.R. §§404.1546(c), 404.1527(e)(1) and (2), 416.946(c), 416.927(e)(1) and 2. Finally, because the record contains other reliable medical evidence, such as the findings of Drs. Mandich and Scrantz, controverting the opinions set forth in Dr. Cockerham's letter of May 25, 2010, the ALJ had no obligation to perform the §416.927(d) analysis to the extent that she failed to do so. Holifield v. Astrue, 402 Fed.Appx. 24, 27 (5th Cir. 2010).

Plaintiff's third challenge to the Commissioner's decision is that the ALJ failed to properly credit her hearing testimony regarding grasping and holding limitations to the right upper extremity. (Rec. doc. 16-1, pp. 14-15).

The law is clear than an ALJ must consider a claimant's subjective complaints of pain and other limitations. Scharlow v. Schweiker, 655 F.2d 645, 648 (5th Cir. 1981). However, it is within the ALJ's discretion to determine their debilitating nature. Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). Pain is considered disabling within the meaning of the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to

therapeutic treatment." <u>Hames v. Heckler</u>, 707 F.2d 162, 166 (5th Cir. 1983). The burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. <u>Selders v. Sullivan</u>, 914 F.2d 614, 618 (5th Cir. 1990); <u>Harper v. Sullivan</u>, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's subjective testimony against the objective medical evidence that has been produced. <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1010 (5th Cir. 1987) (citing <u>Jones</u>, 702 F.2d at 621 n.4). The ALJ may discredit a plaintiff's subjective complaints of pain and attendant physical limitations if she carefully weighs the objective evidence and articulates her reasons for doing so. <u>Anderson v. Sullivan</u>, 887 F.2d 630, 633 (5th Cir. 1989)(citing <u>Abshire v. Bowen</u>, 848 F.2d 638, 642 (5th Cir. 1988)). It must be remembered that the evaluation of a plaintiff's subjective complaints is a task particularly within the province of ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court. <u>Harrell</u>, 862 F.2d at 480. In the final analysis, the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. <u>Carrier v. Sullivan</u>, 944 F.2d 243, 247 (5th Cir. 1991); <u>Greigo v. Sullivan</u>, 940 F.2d 942, 945 (5th Cir. 1991); <u>Wren v. Sullivan</u>, 925 F.2d 123, 129 (5th Cir. 1991); <u>Moore</u>

v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990).

In assessing plaintiff's RFC, the ALJ properly noted her obligation to consider the medical opinion evidence and the symptoms complained of by plaintiff and to determine the extent to which those complaints could reasonably be accepted as consistent with the objective evidence. (Tr. p. 26). Part of that exercise involves making an evaluation of plaintiff's credibility when the functionally limiting effects of her pain and other symptoms are not supported by the objective evidence. (Id.). The ALJ then recalled plaintiff's hearing testimony of being unable to work due to, inter alia, difficulties with reaching overhead and with grasping and holding with the right hand and arm. (Id.). Casting doubt on those allegations were the results of plaintiff's last office visit with Dr. Cockerham on April 8, 2010 at which plaintiff's fusion was again declared to be stable. In addition, plaintiff had advised Dr. Mandich that her right arm pain was significantly decreased after surgery with complaints at the time being low back pain that occasionally radiated into the right lower extremity. Plaintiff also had normal muscle bulk, tone, and strength in all four extremities and normal grip strength bilaterally.

The ALJ noted that Dr. Cockerham's findings had typically been limited to decreased motion of the lumbar spine, positive straight

leg raising on the right, and mildly decreased deep tendon reflexes in the ankle on the right. In none of Dr. Cockerham's contemporaneous notes did he impose any limitations on the use of plaintiff's right upper extremity and none are mentioned in the correspondence to plaintiff's counsel that he authored on May 25, 2010.

Continuing, the ALJ found that plaintiff's daily activities were inconsistent with her allegations of disability while being fully consistent with the RFC assessment. (Tr. pp. 30-31). Plaintiff's abilities to perform such activities is not indicative of someone who is unable to perform any work whatsoever. Leggett v. Chater, 67 F.3d 558, 565 n. 12 (5th Cir. 1995). Adding further support to the ALJ's credibility and RFC assessments were Dr. Scrantz' findings of normal strength and tone in the upper extremities with no evidence of atrophy and normal sensation. The absence of any positive findings in that regard may properly be considered by the ALJ in adjudicating a claimant's disability status. Adams v. Bowne, 833 F.2d 509, 512 (5th Cir. 1987). The ALJ's RFC assessment, the Court recalls, included a limitation on overhead reaching. When weighed against the objective evidence, the ALJ's credibility evaluation was a correct one.

In her fourth and final challenge to the Commissioner's decision, plaintiff argues that the hypothetical questions that

were posed to the VE by the ALJ at the administrative hearing "...
were based on an arbitrary assessment of .... [plaintiff's] mental
residual functional capacity." (Rec. doc. 16-1, p. 16). Plaintiff
alleges that the "[t]he ALJ rejected the extent of severity
reflected in the treating sources in favor of the agency sources",
citing to page ten of the ALJ's decision which appears as page
thirty-one of the administrative transcript. (<u>Id</u>.). A review of
that portion of the ALJ's decision, however, reveals no rejection
or even discussion of the opinions of any doctors who rendered
mental health care to plaintiff including Drs. Bailey, McClendon,
and Cockerham. (Tr. p. 31).

Plaintiff further alleges that the VE was not made aware of
the restrictions that had been imposed by Dr. Fontenelle, the
consultative examiner, or Dr. Ducote, the Administration MC. At
the time of Dr. Fontenelle's evaluation, plaintiff's mood was
euthymic but she appeared somewhat manic in disposition and she
sometimes experienced depressed symptoms. However, her speech was
entirely understandable, she was able to follow multi-step
instructions and to understand the limits of confidentiality, and
her cooperation was excellent. Thinking was reality-based and
there was no evidence of hallucinations, thought disorders,
delusional thinking, or schizophrenia. Social reasoning and
problem-solving skills were good, personal insight was fair, and

plaintiff had well-developed expressive and receptive communication skills. Plaintiff could tend to her own personal needs, cook, drive a car, and manage her financial affairs. Although Dr. Ducote subsequently found that plaintiff had moderate limitations in some aspects of functioning, she nevertheless felt that plaintiff was capable of understanding, remembering, and carrying out simple instructions, performing routine tasks, and tolerating stress and tension even though she could be overly talkative when manic or withdrawn when depressed. Accounting for these limitations, the ALJ assessed plaintiff as being capable of a limited range of light-level work of a simple, routine nature with limited public contact. And contrary to plaintiff's present assertions, the worksheet findings from Dr. Ducote were not ignored by the ALJ. (Tr. p. 31).

By way of her opposition to defendant's motion for summary judgment, plaintiff argues that the ALJ did not adopt or advise the VE that she had limitations in the ability to relate to others or to tolerate stress as reflected by the narrative portion of the Mental Residual Functional Capacity Assessment form that was completed by Dr. Ducote. (Rec. doc. 19, p. 6). Here, again, the Court believes that the ALJ adequately accounted for such limitations by restricting plaintiff to work of a simple, routine nature with limited public contact. Contrary to what she had

originally argued in her own motion for summary judgment, that the ALJ rejected the findings of her treating sources in favor of the Administration's sources, plaintiff further argues that the ALJ dismissed the extent of the restrictions reported by consultative examiner Dr. Fontenelle in favor of those of medical consultant Dr. Ducote. (Id.). A fair reading of the restrictions that were arrived at by both Drs. Fontenelle and Ducote were largely consistent with the ALJ's RFC finding of work of a simple, routine nature with limited public contact.

A hypothetical question to a VE must reasonably incorporate all of the disabilities of a claimant which are recognized by the ALJ. Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994). As respects plaintiff's mental impairments, that appears to have been done in this case. The Court further notes that despite the VE being properly tendered to plaintiff's counsel to correct any perceived deficiencies in the hypothetical questions, including the addition of limitations that were not recognized by the ALJ, counsel had no questions whatsoever for the VE. (Tr. p. 62). Plaintiff should not now be heard to complain of the adequacy of the ALJ's hypothetical questions to the VE when it was not deemed to sufficiently merit adversarial development in the administrative hearing that was held below. Bowling, 36 F.3d at 436; see also Carey v. Apfel, 230 F.3d 131, 146-47 (5th Cir. 2000); Masterson v.

<u>Barnhart</u>, 309 F.3d 267, 273-74 (5th Cir. 2002).

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendants motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>10th</u> day of <u>August</u>, 2012.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE